Your honors, I'd like to reserve two minutes if I may. May it please the court, my name is Mark Lizarraga. I'm an attorney with the Federal Public Defender's Office. I represent the appellant Donald Faulkner. Your honors, this court in Scott stated that crime prevention is a quintessential general law enforcement purpose and the exact opposite of a special need. This court in Scott also stated that a special needs analysis requires inquiry into the programmatic purposes. Programmatic purposes, examination permits the court to look at all the evidence and determine what the primary purpose is. When you look at all the evidence here, I think it's clear that a central indispensable feature of this particular checkpoint is crime prevention. The government concedes that in its briefing that the ---- Suppose you have one to prevent littering. Is that crime prevention? I'm sorry, Your Honor? To prevent littering, would that be crime prevention? Well, actually, littering on BLM land is codified criminal under the regulations. But that ---- Can't you stop people and give them information about littering in order to prevent that from occurring in the national park? I think, Your Honor, if the stop was handing out a litter bag and saying, please don't litter, we have a litter problem, but that's not what was going on here. And the government ---- It's crime prevention, isn't it? I think there's the argument there that it is because littering has been, like I said, codified criminal under the regulations. I don't know that a presumptive unconstitutionality test under Edmund would apply, but I don't know that that would necessarily get past the Brown test. How does this differ from the park ranger who sits in the little booth at the entrance to the national park and hands out exactly the, you know, the flyers with the list of rules and regulations including the same information here, don't litter, don't burn campfires unless it's in a designated area? The difference, Your Honor, is, one, in most national parks like Yosemite National Park, there's a booth there where somebody voluntarily stops to pay a fee. Secondly, the booth is not operated by a law enforcement officer. It's just operated by a park employee. Not only that, the park employee is not asking questions to ---- Now, you can have sworn park rangers who are in those booths. I've certainly encountered them when I enter national parks. Well, Your Honor, I don't think there's anything in the record. I would say my personal experience, not that that's something to include, but is that they're not law enforcement officers. They're just park employees. But I think the critical factor here, Your Honor, is whether it's a law enforcement officer there or a park employee, they're not posing questions that are going to elicit an incriminating response. When you go into Yosemite National Park, nobody says, do you have marijuana in your car? Okay? He is clearly posing questions here that are going to elicit an incriminating response. When he asks people, do you have alcohol, alcohol is a Class A misdemeanor punishable up to one year in prison. To have alcohol? I'm sorry? To have alcohol? Mere possession of alcohol on BLM property is a ---- Yeah, but you're not ---- did they stop them on the property after they'd already entered? Did they stop them? You mean, in other words, the checkpoint where it's located when they stop them is that BLM property? Yes. Yes. And that's why we have a citation here, right? Faulkner was cited for possession of an open container in his vehicle, even though it was a passenger who actually had it. That's a different crime. I mean, that's different. He rolls up to the ---- where the ranger is standing and he's got an open container that's in plain sight inside the passenger area. Right. But the ranger also testified that he has cited people at that checkpoint for possession of alcohol. They were minors. Right. It was also a crime under, I assume, both California and Federal. Yes, but possession of alcohol at that point is a crime regardless of age. It's just ---- What do we do with the ranger's testimony that if people said, oh, yeah, you know, I brought a bottle of wine to go with my picnic or a case of beer, he would say, well, just, you know, set it next to the truck there. You can't take it into the parkland, but you can pick it up on your way out. Well, two things. One, there's obviously some type of discretionary enforcement going on here because he didn't extend that courtesy to Mr. Faulkner. But it was a different ---- it was a different problem. Mr. Faulkner was committing a crime in his presence. He rolled up with the open container in the car. If they roll up with a closed container, that's also illegal, Your Honor. That was the testimony here. And the other thing that I'm trying to get at is that this is a general offense. Mere possession of alcohol, whether the cap's on the container or the cap's off it ---- That's a crime whether you're on or off park property. That's just a general crime. I'm sorry? I said that's a general offense, having the open container in the car. It's not a park offense in particular. Your Honor, possession of an open container, what they did was that they simulated California Vehicle Code. You're absolutely right. But the mere possession of alcohol was a supplementary rule passed by the BLM. That's in the record. That's where Judge Tolman said they weren't enforcing that. The stop didn't enforce that rule. They just told him to leave it, don't bring it into the park. Well, he did testify that he did enforce alcohol rules, right? He cited people for underage. I mean, what does it matter whether the person's 19 ---- That's a general offense. It has nothing to do with being in the park. But I think the critical issue there is the man is stopping people, and he's citing people with Class A misdemeanors. It's, you know, he's made the decision, well, I won't cite him if the cap's on, but I'll cite him if the cap's off. Is that it? I mean, isn't he ---- he's issuing citations for crimes that are readily committed in his presence, which he sees as they reach the entrance to the parkland. But for everybody else, as long as they're not committing a crime, if they do happen to have prohibited alcohol, his testimony was, I told them to leave it outside the park, and they could set it right next to my truck and pick it up after they finished using the parkland. Well, Your Honor, when he stops somebody and he approaches the car and he sees alcohol there with the cap on, that's a crime. Suppose he saw a body in the car. I'm sorry? Suppose he saw a body in the car. See, the ---- Well, the ---- It's not set up for crimes. It's set up to try to keep things out of the park that would be unlawful. Now, if he sees a crime every two weeks while he's doing that, does that make the stop generally unlawful? I mean, he would ---- I assume he would, once somebody stopped so he could tell him don't litter, that any crime he then saw that was a general estate crime, he would do something about it. If he saw somebody pointing a gun at someone, he would arrest him for that crime. Your Honor, you cannot judge the propriety of this stop based on what the officer locates after the stop. I mean, this Court ---- this is not a stop based on reasonable suspicion or probable cause. You have to look at the programmatic purposes. And the programmatic purposes ---- The programmatic purpose is not the incidental case where someone happened ---- that he stops happens to have committed a crime. That's not what they're looking for, the general crime. They're looking to tell people don't bring alcohol in, don't litter, use trash bags, to enforce, you know, prevent people from violating the parks regulations. What's wrong with that? Your Honor, the concession that the government makes in its own brief is they didn't just establish this checkpoint in a vacuum. They established it based on complaints of criminal activities. The government admits in its own briefs that it was in response to the rash of theft, vandalism, gang activity. Those are the reasons why they created the checkpoint. Okay. Suppose they then stop people and say, you know, there's a real problem with thefts in this park. We want you to know we're going to be very ---- take very seriously any theft. If you want to commit thefts, go elsewhere. Would there be anything wrong with that? I ---- it might not ---- it might get passed, like I said, the admin test, but then you'd have to look at it under the brown, the three-pronged brown factor. Because once you have a seizure, they have to justify the seizure because there's no suspicion for it. But, Your Honor, the thing is the officer here is clearly posing questions, like I said, that can elicit a criminal response. Just as if he said, hey, do you have any marijuana? The fact that ---- Maybe he doesn't know where he was from and the guy says, I'm in prison. I'm sorry? I'm a member of the lab. Never mind. Can I reserve the remaining 50 seconds? I'll give you two minutes. Thank you. May it please the Court. My name is Stanley A. Boone. I'm an assistant United States attorney, and I represent the government in this case. I would like to just briefly note about this Class A misdemeanor information. Fortunately or unfortunately, it tends to be unfortunately all crimes that are committed on BLM property are Class A misdemeanors, so that includes littering, et cetera. And that's because of under the regulations that are promulgated by the Secretary of Interior, that's the penalty that is given to that. In reality, do people go to jail for littering? Absolutely not. But I do want to make that clear that that's just the nature of all BLM offenses. What we're looking at here in this case is analyzing whether or not this information checkpoint, if you will, and we concede that it falls within the gamut of the checkpoint types of cases, whether or not there is a grave public concern that the United States, or in this case the BLM, is confronted with. And we say that there is. Now, the defendant wants to say that we are focusing in on the criminal activity associated with why these supplemental rules were promulgated. That's one aspect of the reason that the supplemental rules were promulgated. But there are other aspects that dealt with fire restrictions. And we cannot ignore fire restrictions when dealing with BLM property in that we need to educate the people, the users of the property, about particular fire restrictions. We need to educate the people that use and enjoy this land about littering restrictions in this case. So what the Bureau of Land Management did is they promulgated these supplemental rules to deal with these issues, these grave concerns. And, again, this is a special need for the government. It is limited circumstances. This is dealing with issues on Federal land, dealing with the use and enjoyment of Federal land. This was deputy or sheriff or whatever he was who set up this system for himself. Was there, after you got through him, was there a park ranger who did the normal informational things? In terms of what happened at the checkpoint? After the checkpoint. Yes. If you didn't go to another place, were you stopped for a park ranger, or was this the only stop? No, Your Honor. The record doesn't discuss whether or not that is the case. But the officer did testify in this case, the BLM officer did testify, that there was a bulletin board, which are usually located in the parking lot areas that set forth the supplemental regulation. No other stop?  There was no other stop. No. They didn't pay a fee to get into this particular location. They did not. They did not. This kind of area is what they call a no-fee zone for use and enjoyment, again. And the one thing that I think you just don't see is that the BLM went to such efforts. You brought us a litter bag. Yes. I actually brought you the litter bag. It just doesn't. The three? The 50 cents, Your Honor. That's okay. That the effort of the BLM, if it's pretextual in its application, if what we're looking for is criminal conduct, we're just going to be handing out glad bags. We're not going to the effort that the government went to to print these bags at 50 cents that set forth the rules and regulations, handing it to each individual that comes into the park, setting forth that no littering, put it in this, et cetera, et cetera. These are concerns that the government is trying to address here. It is not for the purpose of trying to write more tickets. Now, the BLM adopted these Class A misdemeanor crimes. But in conjunction with that, have they adopted any sort of guidelines to govern these checkpoints? Not at the time. Informatic guidelines in any way? Not at the time of this stop. There were no written policy. This particular officer in charge of this area thought this would just be a good idea. Well, this particular officer is the chief ranger for this particular area, and I believe, I'm not sure if it's in the record, but he basically supervises three agents in that area, which covers three zones, three different recreational areas governed by that area. This particular officer, as he testified, managed this station 98 to 99 percent of the time. So this officer was here, was the individual that was running, if you will, this informational checkpoint. The officer testified that every car was stopped, that every car was processed, was given a bag, and the stops were generally on average 20 seconds per stop. Now, depending upon information, it may have been longer, it may have been less, if it was a resident, et cetera. And what we're dealing with here was education, getting the information out. If a crime was committed in his presence, as in this case, this officer is not going to ignore that type of offense. And as he testified, that there were, and it is an offense to have alcohol on that, but what he testified to is in those cases in which he cited people for having just what we would call simple possession, those were people that were underage, that even if you had not been on public property, they shouldn't have alcohol. There's no reason that an underage individual should have alcohol. The options were available to this, in this officer. You can either leave it here and pick it up on your way out, or you can turn around and go back. Those are your choices. There's nothing in the record to suggest that this officer was riding the possession of alcohols. It's different in the context of an open container. I think the public policy concerns about open container and the problems associated with that kind of offense. Isn't there also a difference that all those other offenses are general offenses in the State of California, whereas possessing alcohol is not an offense? Possessing alcohol by a minor is an offense. But that's the one I said. That and the open container are both general California offenses. Possessing alcohol by a minor, Your Honor? Yes. Yes, those are general. Having an open container in the car. It's an offense wherever you are. Yes, that's correct. And the ones that he turned around or took the bottle from, those are not offenses in California. That's correct. Yes. That's correct. Those are the supplemental rules. The distinction was that as far as enforcing the rules, he either told them they couldn't come in or he held the liquor for them. Right. But if it was another kind of offense that he observed that was a general California offense, that's when he gave the ticket. If it were, as I said, if it found a body in the car or someone was pointing a gun, any offense that was a general California offense. Well, while that was not elicited at the testimony, I can't disagree with that analysis that that would be the case. What I would say is that had the officer, you've gone through the checkpoint knowing that this is the way into the recreational land, and had he been patrolling the area and individuals had possession of alcohol or had been littering or had not had the correct fire permits, then a ticket would have been issued pursuant to the supplemental rules. And I think that that was, I mean, it's clearly within this officer's discretion as to whether or not to write a ticket at the checkpoint. He chose not to. And he testified that this is what I did. You can either put your stuff here or turn around and use it somewhere else. Which I think in light of the concerns that they had pre-supplemental rules, I think addresses an important governmental concern in dealing with the nature and the use of the enjoyment. The BLM land in this particular case is for the use of all, all individuals to come and enjoy the outdoors and do whatever, camp or you can't camp there, I'm sorry, but to picnic, et cetera. That's what this is about. That's what this addresses. This is not for the purpose of writing more tickets to increase the government, you know. But in all of this, though, he was just exercising his discretion, correct? Yes. Yes. Whether to take the bottles of beer or to have people leave them at the guard gate or to write a ticket for anything, he was just, he was exercising his discretion on the spot. Well, I wouldn't, I wouldn't. Yes, he is. But don't take that as some sort of. There are no rules that said whenever you see a general crime that would be a crime outside the BLM or inside the BLM, you must. Right. Arrest. Right. As with any officer generally in the field has the discretion whether or not to write a speeding ticket for somebody that is, in fact, going over the speed limit. But don't take that, equate that to some sort of arbitrary action on this part. There's a lack of check on the part of the government here in this case. Because, yes, there is that discretion there. It appears that he was exercising it properly from the record as set forth here. There's nothing to suggest this officer was doing anything unreasonable about how he was running the checkpoint. Again, he's handing out the bags, these pre-printed bags, to protect it. It's just like coming in, for instance, I came into the court today and I come into a court every day. And I walk into the building, and it's a federal building, and there's a metal detector that I've got to go through. I can either turn around or I go through the metal detector. There is an interest of why we do that. That is a search, if you will. In this case, it's a seizure. Same analysis, though. But it's I can either turn around or go through it. But there is an interest that we are protecting in doing that. There is no notification that when you walk in the building or in our federal building that you're subject to search. There wasn't notice here. But again, there was notification prior to driving in the checkpoint that this is public land and that there is no alcohol to be possessed with. Yeah. There's, in response to one of my earlier questions, that BLM has adopted regulations or done something with respect to these kinds of information checkpoints in the park. Is that correct? That's correct, Your Honor. And while it's not in the record, I can tell, I think Mr. Lizaraga may know, but it's a result of this particular office here. This chief ranger retired. And so regulations were promulgated because they were promulgated. Now, I use that word loosely in terms of promulgated, but they were written down. Guidelines or something. Guidelines about how these will be run. And that was because this ranger, this chief ranger was retiring, so therefore he would not be the person at the thing. It was not a result of these cases because they were in place at the time of this suppression hearing. It wasn't a result of post-suppression hearing. And I think either in this case or another case which we've noticed is related, that question was asked. And I don't recall if it was asked in this record. Unless there are any. Thank you. Thank you. Your Honor, I just want to briefly state that at the evidentiary hearing, the district court concluded that the purpose of the checkpoint was to keep liquor out of an area where liquor was a problem. The court also concluded that the checkpoint was aimed at people drinking and being drunk and raised in heck and having fights. Clearly, those conclusions demonstrate that the checkpoint is furthering a law enforcement end. He does not want to ---- Doesn't that get back to Judge Reinhart's initial question about one of the purposes is also to prevent people from building campfires when they don't have permits or building them in areas where they're not supposed to have them? And if they do, that's a Class A misdemeanor, as I understand. But if you look at the concessions made by the government, Your Honor, the government stated in its own briefs it was because of the rash of thefts, vandalism, gang activity, sales of drugs. What's wrong in terms of the Brown balancing analysis with the government taking steps to protect the resource and the public's enjoyment or the right to use and enjoy the resource? Isn't that a pretty significant interest here that we have to take cognizance of? Your Honor, the Supreme Court has emphasized that it was going to recognize limited exceptions to, you know, the general rule that a seizure must be accompanied by some kind of individual suspicion. If you look at the Supreme Court ---- If you had a regular ranger station, you know, at the entrance to the park and you had a park ranger at the entrance saying, by the way, here are the things you can't bring into the park. If you have any of them, leave them with us, would there be anything wrong with that? It depends on what you mean by anything. If he's asking, hey, do you have marijuana, that can't go in the park, so leave that with me if it's in a bag. But if you've got it rolled in a joint, then I'm going to cite you for that. Yes, I think if he's asking questions about unlawful substances ---- Firecrackers, firearms, don't ---- none of those are permitted in the park. And he's ---- You know, not asking about heroin. So let's say they don't ask about marijuana either. They ask about things that are lawful everywhere else, but not in the park. Don't bring them in. If you have any, check them in the locker. Would that be wrong? If he is asking questions that can elicit an incriminating response, yes, because it has an investigatory component. And when he asks people, do you have alcohol, and they respond in the affirmative ---- It's not a crime to have it. It is a crime on ---- I'm sorry. Yes. I mean, it's not a crime except when you go in the park. That's what I'm saying. At the entrance to the park, they have this station, and they say, so that you don't commit a crime. Just so we're clear here, Your Honor, it's ---- these are just recreation sites. It's a dirt road. Roots' testimony was that part of the road and into the recreation site. That's all BLM land. So if he sees somebody come in, and they just have a 40-ounce between their legs and the caps on, that's a crime. That's possession of alcohol. Okay? The district court was wrong. The district court found that Edmond didn't govern the outcome here because mere possession of alcohol is not ipso facto a crime like drugs are in Edmond. That's totally wrong. Mere possession of alcohol under the supplementary rules is a crime. So when he's there at the checkpoint on that land asking people, do you have alcohol But not ---- and if they say yes, not treating it as a criminal act, simply holding the alcohol. Well, he is citing people for criminal ---- Absolutely a possession of alcohol. He's citing people for underage, so that's okay for him to have a checkpoint and still cite people as long as if you're overage. If you cite people for some other offense, not what you're looking for, you're just looking to have them leave the alcohol. He's asking. If there's another offense, that you're a minor with alcohol, or you've got an open and you're drinking in the car, that's not what he's looking for. But if he sees that or any other offense, you know, he gives you a citation for whatever offense you commit. But he is looking for alcohol offenses. If he asks, if a car pulls up and there's 18-year-olds, and he says, do you have any alcohol, and they say yes, and he says, how old are you, 18, he's going to write class A misdemeanor citations. And if he sees a gun, he's going to say, do you have a license? Okay. Well, I think that's a ---- Okay. I understand the problem, but ---- I'll submit it. Thank you. Thank you very much, counsel. No, that's okay. Save it. This argument will be submitted. The court will stand and recess for the day, or as some might say, we'll adjourn.
judges: Reinhardt, Paez, Tallman